Okay, Mr. Parrish. Thank you, Your Honors. May it please the Court. Ashley Parrish for the Physician Groups. Your Honors, this case is about whether groups of physicians are entitled to challenge the decisions by health care insurers to systematically underpay for services provided to emergency room patients. In granting summary judgment, the District Court's decision overlooked or resolved disputed questions of fact and disregarded how emergency room health insurance has long worked in this country. If it is affirmed, the decision will have highly disruptive and harmful consequences for doctors and patients. Your Honors, what I thought I would do this morning is three things. First, I'd like to highlight the key themes which I think gives a path to an easy resolution of this case. Second, I'd like to address in a little more detail the specifics of the District Court's across-the-board standing ruling on grounds that the Physician Groups were not assigned the rights to challenge the underpayment and explain why that is wrong and contrary to the evidence. And then third, Your Honors, I'll address the exhaustion question. Our basic point there is that the Physician Groups did everything they were told to do, and the plans should not be allowed to use exhaustion as a trap. So your basic answer on the third is estoppel? I'm sorry, Your Honor. Your basic answer to the third, the non-appeal, non-exhaustion, is estoppel? Estoppel or waiver, however you think about it, Yes, Your Honor. That's correct. And on the first, you're going to tell us, since you say there are disputed issues of fact, the ruling would be vacate remand for an evidentiary hearing into, say, the assignments, for example? Is that what you're asking for? No, Your Honor. I think we would argue that the disputed questions of fact mean that summary judgment is inappropriate. It goes directly to summary judgment. And Your Honor, just to clarify my last question, we do think there's an estoppel issue. We also don't think that they've proven what the process is. So we would say that the process is different. So I just want to make sure. Okay, go ahead. So, Your Honors, if I could just step back, because I do think it's important to think about the practicalities of this, that when a patient goes to an emergency room, you know, they have to file and sign admission forms. And the idea is that they sign these admission forms, and they are not in a position at that point to figure out all the doctors that might treat them. So there's broad language that assigns the benefits to the physicians and the physician groups that are staffing the hospitals. That happens in thousands of hospitals, emergency rooms across the country. That system works very well for the patients, because it avoids the need for them to submit their own claim forms. It works well for the physicians, because they belong to these groups that are staffing the hospitals who are able to submit it. And it works well for the plans, because instead of having the inconvenience of individual patients submitting these claims and getting them wrong, everything works. So that's the standard procedure that was followed here. And not only do we know that the plans conceded this point in their brief, that that was a standard procedure, the parties' 30B6 witnesses testified as much. And most importantly, every single one of the claims that was submitted by the groups was paid by the plans, without objection. Of course, we object ourselves that what they paid was not enough. But the key point is that every one of those claims was paid as if they were proper claims. That evidence means that there is a question of fact that means that this case is not right for summary judgment. Even if they have a question about the assignment, that is more than enough to mean that this case should go forward. Okay. A bunch of quick questions. Yes, Your Honor. You don't dispute our law that says your physicians, the groups, are in the shoes of the members, correct? Your Honor, I wouldn't put it that way, Your Honor. And the reason I say that is that what really happens is when you have an assignment, you're actually extinguishing your own right and you're giving it to someone else. So it may mean what you mean by in the shoes, but it isn't as if you are a representative of that patient. What you're doing is you're then given the right yourself. But there are a lot of bellwether claims here. So let's start with the hardest one for you, the 29 where there was no assignment at all. The missing ones, yes, Your Honor. The missing ones. Yes, Your Honor. Those, the district court seems right if the 30B6 witness, Jordan, worked only in the management company. So he has no personal knowledge of how these assignments are done at the hospital. Why wasn't that Rule 56 ruling correct, at least for those claims? Well, Your Honor, let me first say I wish you'd let me get a head of steam up on the harder ones or the easier ones, but I agree. I think this is the hardest set. I agree it's the hardest one, yeah. And Your Honor, I guess what we would say, and I think you've put your finger on it, is one, is that as you know, there's no strict requirement under case law in the circuit. I admit it's not a circuit decision, but there's no strict requirement of a written assignment. It can be oral and proven through course of conduct. Second, Your Honor. You have to prove with a witness who has knowledge. Well, right. And Your Honor, I think that was the key point is that what the district court judge did was he agreed with us on that. And then he said, your 30B6 witness is only testifying with respect to one. But Your Honor, he was put up as a 30B6 witness and was testifying on behalf of the plaintiffs as a whole. So we would say that you combine that with both the fact that not only they paid for it, but also the plans conceded themselves that this is how the system works. We think that's enough to create the course of conduct that would say that in a situation where we know there are all of these patients that are going, they all sign a standard assignment, and the assignments all look essentially the same, there's no reason that we can't be entitled to prove that on the merits. Two other hard questions. When there is an assignment, if it just were to say this assignment is to the hospital, you would agree that's a different legal entity. You couldn't win. I'm not saying that exists, but the language does determine the scope. Your Honor, I agree the language determines scope. Our argument is not about the meaning of hospital, but that when they talk about providers, treaters. Facility providers. And they say provider is specific, it's individual, it's not group. Right, and Your Honor, I guess I would say two things for that. One is we do think the fact that they paid it. Every claim form says it's been assigned and they paid. But also, let me read from their brief below, because it's such a telling passage of what they said was the undisputed facts. They say, the plaintiffs are the physician groups. The physician groups do not directly collect assignments of benefits from the patients. Rather, the facility, that's the hospital, is expected to collect those assignments and transmit it to the physician groups, the plaintiffs, for each patient treated. And then it goes on to say, it's making an argument here about the anti-assignment provisions, but it says, the forms and process by which they are completed are not in dispute. The very next sentence, after treatment by a physician employed by a plaintiff, that plaintiff, means the physician group, submits a claim for reimbursement to the host plan, since the claims at issue involve treatment by providers in Texas. And, Your Honor, their explanation of the facts matches directly the 30 v. 6 witness testimony and our position, which everybody knows that when you're assigning the benefits to the physicians, that includes both the physicians and the physician groups. Otherwise, it ends up being an unintended windfall, doesn't it? You're absolutely right, Your Honor. And I think this is what the Herman case recognized, which is the reason this process makes sense is because otherwise what happens is the patients have to submit it themselves, and then we have to go and sue the patients, and it's just a circle. And so, obviously, the way the courts have properly interpreted these provisions is to say, this system makes sense. If they want to object, of course they could do that. They could have done that and said, we're rejecting the claim because it was never properly assigned to you. But what they can't do, essentially, and this gets into the flavor, Your Honor, about the estoppel, but they can't let all these claims go by, let years pass. And then when we finally get to a litigation point, start raising objections that it wasn't properly assigned. Well, in fairness, that's what good lawyers do. I mean, there's nothing unethical or improper about raising the legal points that they raise under ordinary contract law or whatever it is. Your Honor, you're absolutely correct. The other side are good lawyers, and the good lawyers are also wrong, which is true here as well, which is that they are raising a fair argument, but it's just not consistent with the law or a proper way of interpreting how these provisions work. Your doctors were going to Blue Cross Texas, and they were getting paid. But every now and then they're told, hey, go to the out-of-state plan. That's what you need. Does the record reflect that then you were told to go back to Texas, or did your clients then become negligent in not requesting or getting the plans? So a couple of things, Your Honor. I take this mostly on the exhaustion point. Well, but I also think it has to do with the anti-assignment clauses. To the extent there are anti-assignment clauses that end up popping up in the plans, isn't your primary answer, we were never given the plans, we asked for them, they wouldn't give them, and that's why we're in Herman Tooland, not Mellowland? Am I missing your argument? No. I mean, that's part of it. That's exactly right, Your Honor. I mean, part of the problem is that so as the physician groups, it's very clear from the record that we have to, under their rules, only go to the Texas plan. We're not allowed to go to others. But there's lots of testimony about this in terms of the 30B6 witness at 83631, that's Wade Cox for them, he said, it must be filed in Texas under the blue card manual, which is what we did. And then Tony Surratt, another 30B6 witness, is at 83561, and the quote is, and under the blue card rules, they were required to submit them to Texas, right? And she says that is correct. Now, also, Your Honor, there's testimony here from the witnesses that when they try to appeal to the home plan— Before you get to exhaustion, though, I'd love to hear your answer to the anti-assignment clauses. Yes. In other words, ERISA estoppel is high. If the contract says no assignment, your answer is what? So a couple of things, Your Honor. And maybe, if I'm not answering your question, but I think this— Well, I may be asking it imperfectly. I thought there were some members here whose plan said no assignments. And as to those, what's the answer from the physician groups? Yeah, the answer to those, Your Honor, is that if they want to assert that objection, that there's an anti-assignment, because we don't have access to it, they cannot wait under the Herman decision. And that's Herman 2. That's Herman 2. And, Your Honor, so you raise Mellow, and the difference in Mellow is Mellow is a situation where a patient receives a statement of benefits and over time says, well, the statement of benefits said I get so much, but in the plan I was only entitled to so much. Which is not the same—that's a true ERISA estoppel. What we're talking about here is a waiver estoppel. Am I simplifying that distinction? Because it's very important in this case that you have to have the plan, or at least you can't be obstructed from getting the plan. Correct. I think it's both that, and even if they gave us the plan, they should be asserting some—look, the anti-assignment—the reason is in Herman 2, what Herman 2 recognizes is that those anti-assignment provisions should be interpreted narrowly because, on one hand, if they say, look, we don't want it to be assigned to anyone out there, everyone sort of understands the point of that. But if the point is to interfere with this process that everyone understands is a good process that works for the plan's benefits and the physician's benefits and the patient's, because of, Judge Smith, your question, the idea you'd then be in a circular of having to sue the patient. Why that's important under sort of the idea of detrimental reliance is that if we get a rejection on a claim and we've just treated a patient, we can go to the patient and say, we don't understand the insurers, but come with us, you'll submit a claim, and we'll help you do it. When they wait three, five, six years for litigation and then raise it, we're now in a very difficult position. It's a real-world question. So a patient comes in and works for Walmart under Arkansas then. Emergency care, but the patient before they're sort of comatose says, oh, and I have an anti-assignment clause. What would happen in the emergency room? Would they say then you're on the hook for everything? So your Honor, I'm going to be honest with you, I don't feel like I can answer the question. I think you start out by saying you think their position, if we accepted it, would pretty much undermine how all emergency rooms get financed. That's what I was going to say. Also, Your Honor, I think that's why when you submit these claims, it's so important. On the claim form, and I could, I'll find it for you, the specific claim form says that on the bottom, there's box 27, it says, is it an assignment of benefits or not? And in every one of those forms, it gets checked and says it's an assignment. So they know when it's coming in. And at that point, it would be very easy for them to say, we've denied your claim because there's an anti-assignment claim, or we've denied your claim because we don't think you're the right assignee. But instead, they paid on every one of those claims, which we submit at bottom is at least a factual dispute. And Your Honors, I believe that's at ROA 82821. The United States plan's argument may be, according to you, is with Blue Cross Blue Shield Texas and all the conduct that they did. That's right. Although interestingly, Your Honor, again, if you turn to their brief at, this is the You know, they've got this idea that somehow the out-of-state plans and the Texas plans don't interact. But here, if you look at their brief, they talk about how they're passing claims back and forth. The Texas then transmits the claim information, as well as its recommendation in terms of the allowed amount to the defendant, which is the out-of-state plan, who administers the patient's health benefits. So they're working together. This idea that somehow they're hermetically sealed and don't work together just isn't supported by the record. We have a minute and a half left on exhaustion. Your best fact and your best case. So on exhaustion, Your Honor, my best fact, I think— Why does the record support you that you did exhaust, and what's the case that supports that? Yeah, so Your Honor, I would look at tab 9, record excerpts, record on appeal 83552. That has a back and forth that says specifically send it to Texas. Your Honor, I have to be honest with you, there are like three or four pieces of this in terms of us calling back and forth on them under the testimony of Jordan. Five phone calls to the home plans, they didn't respond. Constant requests. They're supposed to provide materials to say why something's denied, they didn't. And then, Your Honor, I think I just rest on the cases that we've been talking about, which says— The Gestapo cases. Yeah, exactly. The district court said the doctors didn't treat these patients. Is that accepted by both parties as a clear error? I think so. Well, I don't want to speak for them, Your Honor. That was not an argument that was raised, and I don't know where the district court came up with that. It certainly was something that was assumed. Again, the payment is so significant there because if you thought that the doctors didn't treat the patients, which is indicated on the claim forms, you wouldn't have paid the claims. I mean, it's really quite remarkable to think about all the money they've requested would then get passed on to—just paid to somebody with no idea that they're entitled to the payment. Your Honor, I'd like to save my time for rebuttal unless you don't have a question. Rebuttal. And thank you, Mr. Parrish. Thank you very much. Ms. Stemple. Thank you, Your Honor. May it please the Court. Danielle Desaulniers Stemple for the appellees. The blue plans. I'd like to start by explaining a fundamental distinction in the way this process works that I think will clear up a lot of misunderstandings and misstatements that were in the briefing and that I also heard by my friend on the other side today. If that's all right, Your Honor. Yeah. I was just smiling because a little hard to hear, I think she was turning the volume up. I can also tilt it closer. Okay. Great. So there are two fundamentally different types of processes here. One is for providers and the other is for members. And as Your Honor knows, because the plaintiffs here have come to court trying to stand in the members' shoes, they must follow the process for members. That's the only way they can be here because only members have a right to sue, to recover, or to serve. So for a provider, the provider has the right to sue, to recover, or to serve.   The in-network provider typically goes by geography. If you're an in-network provider, you have a contract with the in-network plan. So here it would be an in-network provider in Texas, contracts with Blue Cross Blue Shield Texas. They go to Texas. Those cases have all been settled, right? There were none under that rubric because none of the plaintiff organizations here were in-network with BCBS Texas. If you're an out-of-network provider, in your own shoes, you also go to Texas and deal only with Texas. But if you are a member, when you are appealing, you go to your home plan. And I think the basic reason for that is quite simple. If you took out your wallet and you looked at your insurance card, there would be a number on the back. And that number would take you to BCBS Arkansas or BCBS Colorado. And that's the plan that holds your plan documents. And your plan documents are what control under ERISA. And those documents lay out things like anti-assignment clauses or the pathway that as a member, you need to follow to sue. Now my friend on the other side has pointed to evidence in the record from depositions that they say established they have done the right thing here. But if you look at those depositions, and I have here the one he pointed to explicitly, the Surratt deposition at 83552, they ask about what a provider would do. And a provider would go to Texas. But this case doesn't involve providers qua providers. It is providers standing in the shoes of members. And the deponents never say what a member would do. They never say a member would go to Texas. But Sutton was your 30B6 witness, right?  Surratt. That's right, Your Honor. But the- Four pages after the one you cited, Sutton, Surratt is asked if the plaintiffs had submitted their dispute to Anthem, Anthem would have said wrong entity go submit it to Texas, right? If the plaintiffs, Surratt is asked if the plaintiffs, these plaintiffs, answer, they would have been directed to send it to their host plan. Question. Okay. So what could plaintiffs have done here? Answer. I don't know. Do you have the page, Your Honor? I just want to make sure I'm in the right spot. 83564. 564. I don't have that one here in front of me. I can't- Well, I'm reading it correctly. But I think- If the plaintiffs had submitted the dispute about Anthem, Anthem would have said wrong       to Anthem, out of state. They would have been told wrong entity to submit it back to Blue Cross Texas, right? Answer. They would have been directed to send it to their host plan. Okay. So what more could the plaintiffs have done? Not providers, not members, plaintiffs. I don't know. So my understanding is that she's talking about providers, co-providers, and it was just a miscommunication.   It was just a miscommunication. Okay, but that sounds like a fact- 83- That sounds like a fact issue to me. I would disagree, Your Honor, because the record is replete with evidence showing the opposite- Okay. Another hearing you would remember. January 2021. You remember that? The hearing? In this case? I'm sorry, Your Honor? The plaintiffs are begging for these member plans, member plans. But the answer in January 2021 is, quote, that's very manual. It's labor-intensive. It can't be done. So even in January 2021, at the discovery stage, pre-litigation, the plaintiffs still don't have these plans that you say are decisive on assignments and exhaustion. And they do have them now, Your Honor. There was some pre-- But doesn't that exactly fit into Herman 2? You can't say, oh, now, years later after discovery, we found an anti-assignment clause. That patient, you shouldn't have been paid the money that Texas paid. No, Your Honor, and I think that's true for three reasons. First, in Herman 2, the issue there was that they were refusing to pay, and then they come to court and refused to pay. And this court has been extremely clear in subsequent cases, like Le Tourneau and Dialysis Nuco, that payment is distinct from the right to sue. And so that takes Herman 1 off the, Herman 2, excuse me, off the table completely. But even separate and apart from that, Herman 2 is really best understood as an early application of ERISA estoppel, which this court later recognizes in Mello, as the courts of appeals sort of developed a consensus around that. But it makes sense a member can't refer to extra-contractual discussions to get more, because they have the plan, the contract's there. If the evidence in this record is either conclusive or at best disputed, that these plaintiffs never could get the plans that you are now saying foreclosed them by assignment or exhaustion, what could the plaintiffs have done at the moment of treatment, according to you? How were they supposed to find out? I think there's plenty of things they could have done, and the record shows this. Every time they send a letter to Blue Cross, excuse me, not every time, almost every time they send a letter to Texas, Texas says, we don't have those documents, ask the home plan. They could have called the member and asked for the information. They could have called Texas. In the reply brief, they say when they go to the home plan, the home plan say go back to Texas. Respectfully, Your Honor, that's a misrepresentation of the record. Well, it's got a lot of record sites. It does, but what they're citing there is the Jordan deposition, and in the Jordan deposition, he says that, and then when he's pressed on it, he admits he can't find any record of that happening with any of the Bellwether claims. They can't even say whether it happened with any of the other 250-some thousand claims in this case. They don't put in any evidence of it, and what instead we have is page after page of Texas saying go to the home plan. We don't have those documents. Ask the member. Go to the home plan, because if you're coming to court as the member, if you're trying to appeal as the member, that's what the member does. What record site do you have that they ever were given a plan by the home plan? They weren't because they never asked the home plan. If they asked the home plan, the home plan could have provided it, but they only asked Texas. Okay, well, they have a lot of record sites about asking and then getting back, but do you recall back at the last hearing that I found on this, you actually said to the district judge, yeah, let's have a full evidentiary hearing on the assignments. That's right. I think, Your Honor, I'm not positive offhand. But then the district court didn't. No, the district court found, I can't speak for why the district court didn't, because that's not in the record, but this really is a pure legal question about contract interpretation, and the contracts were all put into the many, many thousands pages of summary judgment. They gave you the contracts. You refused to give them the plans. No, Your Honor, that's not true. Well, the January 2021 hearing, I read it. Nope, Your Honors, you don't need to get those. We don't need it. It's too intensive. Quote, it can't be done. This case turns on the assignments. We've paid fully, and there's a statute of limitations problem. It was not asserted then that, oh, the member plans foreclosed. They should have somehow gotten them. So that's my reading. I'll make sure I'm right about that, but I'm going to go back to the question I have for you, which is at the emergency room physician moment, what should the doctors have done? I think there's a very easy fix, and that's for the hospitals to modify their forms, to say we assign rights to the hospital, the treating physician, and any related management entity. In addition, the plaintiffs here could have tried to solve this after the fact by doing a sub-assignment, which this court has approved in Tango Transportation, from the physicians to the management entities. They didn't do that either. So I think their suggestion that this is some sort of insurmountable policy problem is just not false. It's just not true. Why did Blue Cross Blue Shield Texas pay them then, if they're not entitled to payments? Your positions, they're not entitled at all, and it's so conclusive there's not even a dispute of fact as to that. Why were they all paid? So the district court found that it was not established in the record whether the physicians here were the treating physicians. But you aren't disputing that, because you stipulated that they were. I don't think we stipulated that they were, but I also don't think we need to win on that, because the district court also found— So my question is, why were they all paid if they're conclusive, irrebuttable, no fact dispute, non-assignments to them? Why were they paid by Blue Cross Blue Shield? So a couple of reasons. I think the primary one is just because of the way the system works. We don't require or check that there's an assignment, because the payment is a convenience to members generally. And in fact, often you're prohibited from limiting payments. You pay, but if they say you underpaid, that's when you pull it out and say you weren't supposed to get money at all? No, we don't say they weren't supposed to get money at all, Your Honor. The question is whether they were entitled to more. And I would note that even their own expert agreed that we paid the proper amount on more than half the claims here, in fact, up to 700 percent of the allowed amount on some of those. So it's not appropriate to suggest that this is some sort of windfall for our companies when their own expert has admitted that. But I also just want to be clear that there are many ways that we can win this case, Your Honor. I mean, we've been talking sort of about a bunch of them back and forth, but the lack of a valid assignment to the plaintiffs here, and the forms are quite clear. There's a number they no longer dispute. There are a lot of forms, and they have a lot of different language. So when you say they're quite clear, if it states in their provider, your position that's clear it doesn't apply to provider groups? Our position is that it doesn't apply to management entities like plaintiffs here. None of them are providers. None of them are doctors. They are simply organizational entities. They're organizationals that all the doctors work for. So you're saying if the assignment says, I am giving my rights to a provider that treats me, and these people were the treating physicians, you're saying they're foreclosed because they're pursuing through a group that's called a provider group, even though they were the providers? Doesn't that turn on whether the word provider is collective or not? No, I don't think it turns on whether the provider was collective or not. The physicians here are independent contractors of these organizational entities, and Texas law is quite clear that an organization and its members are not considered one and the same. The Chilkowitz case actually addresses this quite directly there. It's a doctor and a professional organization named for him. So I think it's Dr. Smith and Dr. Smith PC, and the court says those are not legally one and the same. Under Texas law, they're different. So I do think that the assignments themselves are unambiguous, that they're not assigning rights to the entities here, and it's- The entity across the shield again paid them. So it didn't think they didn't qualify, but now legally you're saying they don't. And it's our right to come into court and say, we were willing to pay as a convenience to member. Some of the plans even say, you're not allowed to assign your right to benefits, but we'll pay as a convenience to the member. Because we trust that everyone is sort of acting on their best judgment and their best faith in this system, and the expeditious processing of these claims to providers or to plaintiff organizations here is beneficial to providers, to our clients, to plaintiffs as well. How many of the assignments say, I only assign my rights to the hospital where I live? 29. What? 29 say to the hospital, and they've given up those 29 here. They have given up. We said that in our response. They didn't contest it on reply. There are 82 remaining that have catch-alls. Your Honor, you're correct. There are different formulations, but fundamentally they're all the same. And the plaintiffs have actually agreed that all of the claims in the case here follow this same generic catch-all formulation. You can see that in a post-summary judgment status report at 84061-62. If I think there's an issue of fact as to some of them that aren't explicitly to another a separate argument? That's right. That is a separate argument that applies to a number of them. And some of those... If it said you're entitled to all remedies, that would include right to sue, yes or no? All remedies may be all benefits is the language that they usually use, which we've disputed because in this context, as Your Honor has pointed out, benefits are considered to be separate from the right to sue. Dialysis NUCO is a case I would point you to there. Right to appeal? I assign you the right to appeal? Yes? Does it cover?  No, it doesn't cover. The right to administratively appeal is different from the right to appeal in court, so it would  Why aren't these all issues of fact? The scope of the assignment language, if Your Honor stopped from asserting it in the first place. Why aren't... How could these not be issues of fact, as both parties seem to agree at the preach before this order came out? They said, we need that evidence you're hearing. Courts resolve these sorts of issues on summary judgment in the ERISA context all the time. They would go to a bench trial anyway, and the question is whether there's a material dispute of fact. And if the contract language is unambiguous, there isn't, because an unambiguous contract language is... Your position, therefore, is every single one of these has unambiguous language that excluded these treating physicians, even though they were all paid? Every single one excludes the provider entity organizations here, the plaintiffs, yes, even though they were all paid. And again, Dialysis NUCO says it three separate times. It even says it would be legal error to say that the right to benefits means that you have a right to come into court and sue. And it's because ERISA so clearly limits the right to sue to the member, and only after the member has exhausted, that courts have done a very careful look and drawn this close distinction. Am I right in Dialysis NUCO, they asked for that assignment at the last minute, right? They asked for the assignment of the right to sue... A couple days before suing? At the last minute. That's right. Whereas here, according to the record, at least disputed. My read of their reply brief, which you haven't had a chance to answer, the record is replete. Even your witness says, they did ask, they did ask, they kept getting told no, and kept getting sent back to Texas, who was paying? But again, they asked the wrong people. They never asked the home plans. And I would point you to the concessions that they make on this at ROA 81862 to 863, Mr. Jordan references the test batch submitted to Arkansas, but then he admits he doesn't know if that included the Bellwethers. And then at ROA 79122 to 35 in admissions, the plaintiffs agree that they did not submit written appeals to Arkansas. They submitted them to Texas. So again, they never went to the entity the member would go to. They never submitted any appeals to the home plan. They only went to the host plan. And Texas, again and again and again, says, we are not the right ones. Go to the home plan. And they never do. So they certainly haven't exhausted the administrative appeals process in that respect. I'd also just like, again, to make clear that they would need to run the table on a number of claims here. And there are various ways that we can win. I think the simplest is to rule for us on the lack of a valid assignment to these plaintiffs, the anti-assignment clauses, and ERISA estoppel combined. Those three would knock out every single claim here. There are other formulations you could use. That assumes that any of the assignment language is unambiguous, right? That's right. If your honors think the assignment language is ambiguous, we could win on all but five claims by going just on anti-assignment and ERISA exhaustion. That would knock out everything. And in fact, those five also were not exhausted. They just weren't included in the summary judgment briefing below. The plaintiffs have admitted that they didn't exhaust a single one through the home plans. They only ever tried to go to the host plans here. I'm happy to spend another moment on the anti-assignment clauses if your honors have further questions. Otherwise, you'll get to exhaustion. Otherwise, I'll go to exhaustion. The last point I'd just make on the anti-assignment clauses is that they have not even attempted to show the requirements under ERISA estoppel. I think my friend on the other side said they were making an ERISA estoppel argument. They expressly disclaimed ERISA estoppel for the anti-assignment clauses in their brief. That would require things like extraordinary circumstances. They only rely on Herman 2, which this court has never applied as a standalone estoppel of anti-assignment clauses theory. And Littorno in particular has been quite clear that Herman 2 should be limited to its facts and the clauses that issue there are not similar here. But turning to estoppel. Now, do you have any case that says if the companies were refusing to provide the plans an anti-assignment clause would still be enforced? Do you have any case that stands for that proposition? I don't have a case that stands for that proposition. But the cases I would point you to are MESA and Bourgeois, which say that you have a duty of reasonable inquiry to the plan administrator, which here is the home plan. And they never asked the home plans for the documents. Those two cases assume that the person, the claimant, had the plan, right? The negative implication of both those cases is clear. You have to have the plan to have an anti-assignment clause apply against you, MESA and Bourgeois. And the members have the plans here? Well, they don't. The providers didn't have the member plans. You're saying there's no dispute of fact that they would have been given it if they'd ever asked. That's right. And they've admitted that they never asked the home plans. Okay. Well, I'm reading, I mean, looking at their brief with record states at the end. And they cite the Jordan deposition and the Jordan declaration, which says they're referencing this test batch. And again, you know, there are admissions. I can't cite them all. There are... I know, but your own witness, I just read to you, your own witness said, what should the plaintiffs have done? They've got to go back to Texas. Right there, your witness. Because the way they're asking the question, she thought they meant the plaintiffs as providers standing in their own shoes. Okay. And if you read the entirety of the deposition, I think it's quite clear. So you have to disbelieve what she answered under oath for you to be able to win. No, I think you believe her and you believe all of the others who say it. And again, Ms. Surratt says a Texas provider appeals to Texas. Providers are sent to Texas. Did the District Court in its ruling say that he was disclaiming your own witness's sworn testimony or that she made a mistake and that's why he could rule the way he ruled? I don't know if he specifically addressed this, but the District Court relied on ample evidence showing that...   Go ahead. Exhaustion. Your time's running out. So I think I heard my friend on the other side today say they were making an exhaustion estoppel argument. But I just want to be clear that as the District Court found at ROA 84052, note 11, they expressly disclaimed an exhaustion estoppel argument below. Their exhaustion argument hinges on the idea that they did the proper thing by going to the host plan, which is Texas. And as I've explained, that is not correct. And so once that brush is cleared, you just have to go look at the exhaustion exceptions. And there are two separate ones here. I'll start with futility. I think that's the even easier. I think they're both easy. But Judge Smith, as you said in the McGowan case, futility requires a showing of hostility or bias. They don't even attempt to show that. The best they have is a sentence or two in their brief where they say, well, Texas told us, you know, they sent documents back unopened. But the record, again, shows page after page of Texas showing, saying that you need to go to the home plan. They also have the argument about the failure to follow procedures. They go on the website, the blue card manual, and they are a doctor. Where does it tell them to exhaust? That manual is specific to in-network providers. It says it on page one of the manual. This is for contracting providers in the Primera Blue Cross Network, which is not these plaintiffs here. That is, though, how they did try to exhaust, correct? That's how they tried to exhaust, which is the provider process. No. They submitted the payments properly to Texas. They could have, in theory, submitted them to the home plan. I don't think there's anything in the record that asks about that. But the reason they submit to Texas is because geographically they're in Texas. So as a convenience to everyone, they're able—and I see my time is expiring. If I may finish, they're able to bundle all of these claims together and submit it to  Texas takes the first cut at applying the geographic rate in Texas. And the reason for that is so that if you're a Texas provider servicing a patient from California, you're not going to get a fundamentally different application in the first instance of the payment rates. You'd get something similar to if you happen to service the patient from Texas. That assessment is passed to the home plan, which looks at it against the contract and says, actually, you know, our formula would apply a different limit in this situation. And they send it back, and then Texas remits the payment. So again, it's a packaging as a convenience thing. And one last point, if I may, because there was some discussion today about the fact that, you know, these claims were let to linger for a long time. And I think this case is fundamentally different from most ERISA cases and most decisions this court has because it involves so many claims that have been packaged together. Typically, you see one member, one provider, or one claim. And these rules are easy to apply there. Here, the plaintiffs waited. They waited four years until they had amassed hundreds of thousands of claims. And then they came to us. And if they had come earlier, after one claim, 10 claims, 100, even 1,000 claims, we could have had these discussions. We could have resolved these issues in the administrative process. We could have made clear that they were going to the wrong place. We could have talked about what language might have been sufficient for the assignment. All right. I think your point is made. Thank you. Thank you, Ms. Temple. Mr. Parrish, Roberto, you might as well respond to that last point first about the delay, four years delay. Your Honor, I don't understand it, and I apologize for not being dense, but we filed the complaints, the claims. They paid on the claims. There was then a dispute that we raised that we said, you've underpaid us. There were some 200,000 in the record. I think it actually was more at some point. Most of the plans recognized that there had been a problem, and they settled, and we've now got 60,000 claims left. Your Honor, I don't think the only delay here has been their delay in asserting the anti-assignment provision and the fact that this was not properly assigned. We certainly were entitled, and there's been no statute of limitations or other argument to suggest that. Your core argument is that the physicians group should have known that the member appeals process required you to get the plans, and had you gotten those plans, you would have seen anti-assignment, and therefore, it's your delinquency. It's such a strange argument, Your Honor, because first, we were told that as a providers, we could only talk with the Texas plan. The record is also clear that we called the home plans. This is 81861, 81862, 81863, we called them five different times, and each time we were told to go back to the Texas plan. Their own brief concedes, and she conceded today, that the Texas plan and the home plans are in contact all the time. I'm not sure- Slow down, because told only through Texas, I think that's fine. I don't remember she said that's wrong. You called them. I don't hear that she appealed those. Your third statement, each time you were told to go back to Texas, Ms. Stemple strongly suggests that your record cites at 23 and 24 of the reply brief are wrong, that I'll never find that. And the only witness that I quoted, she wasn't familiar with, but it was a mistake, that you were not told you had to go back, you were not refused those plans. Is there a fact dispute? I think there is a fact dispute, and one of the things I think is because she is sort of suggesting that there is this big difference between providers and member claims. The first thing I would ask the court to do is stop for a moment and say, okay, let's accept that that is true. When does a provider seek payment for itself as opposed to on behalf of a patient? And the answer is, it's not in the record, but we can't think of any. The whole distinction seems to have been made up. So obviously it makes sense that if you're a member submitting on your own, you would go to your home plant. But if you are a provider, you're only submitting these claims on behalf of the patients that have signed the rights to you, and the rules are very clear there that you go to Texas. I think, Your Honor— You go to Texas, but you're still restricted by what the member would be restricted. So don't you have to ask for—I guess your answer is you did ask, but you were confused. That's my first answer. Okay, but what's the best record support for that? Ms. Stimple strongly disagrees there's a fact dispute with that. Well, Your Honor, I think that the quote you read is very good about that. I'm not sure that was in your brief. I think that was a law clerk of mine that found it. Maybe it was. But did you have anything in your brief? When I turn to those record sites on page 23, 82841, 83203, are those going to stand for you were told, go back? I hope they do, sir, Your Honor. I sure hope so. Yeah, but if you look at tab 9, record on appeal, 83552, that's the deposition testimony by the plans. Sticking with the same example of Texas being the host plan, you have a member living and working in Texas receiving health care. Where does the Texas provider submit an appeal or a dispute request? They would send that to Texas. And where is that? Yes, where is that requirement derived? It's part of the licensure agreement that the plans hold with Blue Cross Blue Shield. I'm agreeing Texas is the agent. I'm wondering about they were not given the plans. I sure thought that was what was said at the January 2021 hearing. That is right, Your Honor. And also, let me go back to your question because it's so important, Your Honor. Is it your right about to ask me about stand in the shoes? Because the point is, is that we're not anymore just acting on behalf of the members. We've actually been assigned the rights, which is why when it tells you you as a provider must go to Texas and you as a provider must communicate only with Texas, it was very appropriate for us to go there. But again, Your Honor, if you go to 81861, you'll see testimony in the record 862, 863, where he called the phone calls to the home plans that's outside of Texas and was told to go back to Texas. Your Honor, I would say on this, though, that if I'm wrong about all of that, then you still have to look at deemed exhaustion, which we haven't talked about, but you also have to look at futility. And the point of deemed exhaustion, very quickly, is that you can't have this runaround. The easiest way to solve this is that if they deny a claim, they can attach the box, say, here are the procedures that you should file in order to follow an appeal. That's what happens everywhere else. Instead, what they've done is it's clear from the record there's been a back and forth. And even today, there's no point to, we told them, here's the procedures, A, B, C, D, E, you failed to follow those. Instead, what we have is a lot of record evidence of different things being told at different times and that just isn't enough. So we would argue even under the deemed exhaustion or the futility, as you noted the judge, talks about futility as bias, but that's not the only reason why futility applies. Lastly, your honors, I would say on the issues relating to assignment, I would just close by saying, they paid on every single claim, we think that's enough to create a disputed fact issue. They described the process the way that we are describing it in their brief below, which we think is enough to create a fact issue. They also had the 30B6 witnesses that support that. And then finally, on the anti-assignment, the Herman 2 decision is controlling here, and we think that it should just be applied by this court. And with that, unless you have questions, we're very grateful for the court's time. Thank you, Mr. Parish. Your case is under submission. Thank you, Your Honor. Next case, Pieda.